Filed 7/19/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.W., a Person Coming Under the Juvenile Court Law. _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JESSICA W., Defendant and Appellant. | B313447 Los Angeles County Super. Ct. No. 17CCJP02230A |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge. Affirmed.

Linda J. Vogel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother Jessica W. appeals the juvenile court's order terminating her parental rights to daughter J.W (born 2008). She does not challenge the basis of the termination of her rights. Her sole contention is that the Los Angeles Department of Children and Family Services (DCFS) did not comply with its initial duty of inquiry under Welfare and Institutions Code section 224.2, subdivision (b).[1] Specifically, Mother acknowledges she denied Indian heritage, but she contends DCFS failed to ask maternal extended family members whether J.W. is an "Indian child" within the meaning of Section 1903 of the federal Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.)

We find the juvenile court erred in determining that ICWA did not apply without evidence that DCFS questioned extended family members despite having contact with those same family members. However, we conclude the error was harmless because J.W. was placed for adoption with her maternal grandmother. As a second ground, we find no prejudice because there was nothing in the record to suggest that J.W. had Indian heritage or that mother's denial of Indian heritage was uninformed or incorrect.

## BACKGROUND

In December 2017, DCFS filed a section 300 petition alleging nine-year-old J.W. was placed at substantial risk of serious harm when Mother allowed a registered sex offender to live in the family home with unlimited access to J.W. J.W.'s half-brother is a former dependent of the court, having been adopted by maternal grandmother in 2009.

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

When the petition was filed on December 4, 2017, the whereabouts of Mother and J.W. were unknown. On December 5, the juvenile court ordered J.W. detained and issued a protective custody order for her and an arrest warrant for Mother. The Detention Report includes a cursory statement, "The Indian Child Welfare Act does not apply." Six months later, on June 1, 2018, Mother contacted DCFS. On June 6, 2018, J.W. was present in court, detained, and placed with her maternal uncle and aunt.

On August 13, 2018, Mother and the alleged father were present in court (father is not a party to this appeal). Each filed Parental Notification of Indian Status forms stating no known Indian ancestry. The juvenile court found no reason to know J.W. was an Indian child and advised those present to keep it apprised of any new information relating to possible ICWA status. The court found father to be an "alleged" father only and set visitation for Mother only. It continued the adjudication hearing to August 24, 2018. On August 24, the juvenile court sustained the petition as interlineated and dismissed father from the proceedings based on his "alleged" father status.

At the dispositional hearing on September 28, 2018, DCFS recommended no reunification services because Mother had failed to reunify with J.W.'s half-brother. The court found J.W. to be a dependent of the court, extended her placement with maternal aunt and uncle, and granted Mother reunification services, finding reunification was in J.W.'s best interests because J.W. was "close to her mother, and . . . she very much wants to reunify." The court noted that at the jurisdictional hearing, the minor "presented as very sad that she was being removed from

her mother, and . . . it did appear to me that she is very close to and attached to her mother."

At the six-month and 12-month reviews, the juvenile court found Mother's progress with her case plan "appropriate" and "in partial compliance." On January 24, 2020, Mother asked for an extension of services because Mother was homeless. Counsel for J.W. joined in the request because J.W. was bonded closely with Mother. DCFS continued to recommend termination of reunification services for Mother. Expressing concern about how disappointed J.W. would be if Mother failed to reunify, the court found Mother's progress not substantial. Nevertheless it extended reunification services and granted Mother's request for a visitation schedule as she was driving to and from Arizona where she had relocated.

In March 2020, J.W. was placed with her maternal grandmother. In November 2020, J.W. said she wanted to stay with her grandmother and did not want her mother in her life any longer. When J.W. told Mother this during a telephone call, Mother told her, "don't ever call me again." J.W. told her social worker that she had given "up on mother trying" and wanted to be adopted. She said "maybe later" she would be open to a relationship with her mother.

At the November 17, 2020 disposition hearing, DCFS recommended that reunification services be terminated because Mother had received more than 18 months of services and her housing instability was a barrier to reunification. Mother asked the court to release J.W. to her and permit J.W. to live temporarily with maternal grandmother until Mother got settled in California. Mother had secured a job and completed her case plan. Mother made a personal statement to the court. She said

J.W. was living with her half-brother and maternal grandmother and living with family members "feels like home to her." The juvenile court found Mother had "substantially complied" with her case plan, but found she had made insufficient progress. The court terminated reunification services.

At the permanency planning hearing on May 18, 2021, Mother failed to appear. The court found J.W. adoptable, terminated Mother's parental rights, and designated maternal grandmother as J.W.'s prospective adoptive parent.

This appeal followed.

## DISCUSSION

In enacting ICWA, Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." (25 U.S.C. § 1901(4).) ICWA reflects the intent of Congress "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902.) The court is obligated to ask each "participant" in the proceedings whether they have reason to believe the child is an Indian child and to instruct the parties to inform the court if they subsequently receive information that provides a reason to know

5

the child is an Indian child. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882–883.)

ICWA authorizes states to provide even more protection than the federal statute provides. In 2006, the California legislature enacted parallel statutes to affirm ICWA's purposes and mandate compliance with ICWA in all Indian child custody proceedings. (*In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) In California, the child protection agency is obligated to ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b).) The child protection agency, in this case DCFS, must complete the Indian Child Inquiry Attachment form ICWA-010(a) and attach it to the petition. (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a)(1).

Here, DCFS did not ask Mother's extended family members about their Indian ancestry, despite having contact with maternal grandmother, uncle, and aunt. This was a violation of California law. But the next question is whether the error was prejudicial. A prerequisite to reversal of a trial court's decision in California is showing a miscarriage of justice. (Cal. Const., art. VI, § 13.) To answer that question, we delve further into the concerns prompting the enactment of ICWA.

"Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) In enacting these

6

provisions, " 'Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians.' " (*Id.* at p. 9.)

The concern about separating Indian children from their Indian families, heritage and culture was the topic of extensive Congressional hearings when ICWA was enacted. As one commentator wrote, the " 'wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today.' " (Atwood, Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance (2002) 51 Emory L.J. 587, 601, cited in *In re A.C.* (2022) 75 Cal.App.5th 1009, 1014.) "ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family." (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 881.)

Here DCFS did not fulfill its duties under section 224.2. But we are hard pressed to find prejudice, that is, a miscarriage of justice under article VI, section 13 of the California Constitution. Assuming for the sake of argument that an inquiry would have discovered that J.W.'s maternal family held Indian roots, the purpose of ICWA—to prevent the removal of Indian children from their Indian families—is not implicated by the juvenile court's final disposition. When J.W. was found adoptable, her prospective adoptive parent was her maternal grandmother, who had already adopted J.W.'s half-brother. J.W. was not facing alienation or separation from any assumed Indian

7

ancestry. Indeed, the juvenile court's disposition placed her back within the assumed Indian family tree with a grandmother who was one generation closer to the family's assumed Indian heritage than any of J.W.'s other relatives.

Consideration of ICWA's placement preferences further bolsters our finding of no prejudice. Section 1915 of title 25 of the United States Code provides that in any adoptive placement of an Indian child under state law, "a preference shall be given, in the absence of good cause to the contrary, to a placement with [¶] (1) a member of the child's extended family; [¶] (2) other members of the Indian child's tribe; or [¶] (3) other Indian families." (25 U.S.C. § 1915 (a).)

Here the juvenile court implemented the first preference by finding J.W. adoptable by her maternal grandmother, a finding that comported with J.W.'s own request to be adopted by her grandmother. J.W.'s request came years after waiting for her mother's life to turn around. She asked the court for stability and the juvenile court's disposition ensured that she finally received it from and among family members (her maternal grandmother and her older half-brother) whom she knew and trusted. (*In re Arturo A.* (1992) 8 Cal.App.4th 229, 241, fn. 6 ["we adopt the proposition that a child has a constitutional right to a reasonably directed early life, unmarred by unnecessary and excessive shifts in custody."].)

Thus we have assessed no prejudice because the trial court arrived at a disposition that approved adoption by the minor's maternal grandmother, which would have been the first placement preference had J.W. been found to have Indian ancestry under ICWA.

A second way to assess prejudice has been set forth in *In re Dezi C.* (2022) 79 Cal.App.5th 769. There, our colleagues in Division 2 held that where the parents were raised by their own biological relatives and where the record suggests no reason to believe that the parents' knowledge of their own heritage is incorrect or that the children may have Indian heritage, no prejudice arises from DCFS's failure to conduct a complete inquiry. Here, Mother was raised by her biological family with whom she had remained in contact, and the record does not otherwise suggest that Mother's denial of Indian heritage is ill informed, unfounded, or incorrect.

These proceedings started when J.W. was nine years old. By the time Mother's parental rights were terminated four years later, J.W. was entering her teenage years and she was, by her own words, tired of waiting. She lost an innocent part of her childhood because of this case; she should not be obliged to put her teenage years on hold as well where this proposed adoption does not perpetuate the abuses ICWA was enacted to prevent.[2]

---

[2] A tribe might argue that it was prejudiced because the lack of inquiry (and notice, if a reason to believe J.W. was an Indian child was discovered) prevented it from requesting a tribal customary adoption which is implemented through sections 366.24 and 366.26. However, section 366.26, subdivision (h)(1) provides that "[at] all proceedings under this section, the court shall consider the wishes of the child and shall act in the best interests of the child." Here, the trial court did consider the wishes of J.W. who wanted to be adopted by her grandmother. And it made a finding that returning J.W. to the custody of her mother was detrimental to her physical and emotional well-being. The findings and disposition approving adoption by maternal grandmother did not prejudice any possible tribal intervention. If, for some reason, the proposed adoption by maternal

**DISPOSITION**

The trial court's order is affirmed.

**CERTIFIED FOR PUBLICATION**

                                        STRATTON, P. J.

I concur:



        HARUTUNIAN, J.[*]

---

grandmother does not go forward and adoption by a non-family member is contemplated, then the trial court is directed to ensure that DCFS finishes a complete inquiry into the maternal side of the J.W.'s family.

[*]      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**WILEY, J., Dissenting.**

It would have been overwhelmingly simple for the Department to ask the maternal relatives about Indian ancestry. The Department knew where these relatives were. It was communicating with them already. It had only to ask one simple question. The Department did not ask, and it does not explain why. The burden on the Department would have been slight, while the benefit to a tribe would have been substantial if new information developed a valuable lead. Tribal interests here are strong, and are supported by a long and sorry history.

The Department says any error was harmless because the *mother* denied Indian ancestry. The Department's premise must be that we generally can count on a parent like the mother to know her own Indian ancestry. That is, the claim must be *people usually know if they have American Indian ancestry*.

The Department's factual premise is incorrect. The state statute tells us so. The statutory amendment shows the Legislature learned from experience that people like the mother sometimes do *not* know they have Indian ancestry, so asking extended family members is important. The Legislature also learned parents or Indian custodians may be afraid to identify Indian ancestry or wish to evade tribal jurisdiction. (Cal. ICWA Compliance Task Force, Rep. to Cal. Atty. Gen.'s Bur. of Children's Justice (2017) p. 28, available at <https://theacademy.sdsu.edu/wp-content/uploads/2015/06/icwa-compliance-task-force-final-report-2017.pdf> [as of July 6, 2022], archived at <https://perma.cc/TEA9-R9V3>.)

Tribes are the victims here. Tribal involvement is enshrined in law. Tribes have a right to intervene where there is an Indian child. (25 U.S.C. § 1911(c).) Absent good cause to the

1

contrary, a state court must transfer proceedings to a tribal jurisdiction. (25 U.S.C. § 1911(b); see California Courts, Tribal Justice Systems <https://www.courts.ca.gov/3064.htm> [as of July 13, 2022], archived at <https://perma.cc/47X8-DGEJ> [39 California tribes have access to a tribal court].)

When the Department does not inquire as the law requires, tribes lose chances to discover children who could help preserve tribal heritage and culture.

Placing the child with the maternal grandmother without alerting tribes does not help tribes, which are the real parties in interest. If the maternal grandmother has information about Indian ancestry, the tribal interest cannot turn on whether this grandmother has an active interest in making tribal contact. To forecast the grandmother's attitude about a tribal heritage would be speculation.

This is my fifth dissent on this issue, and I incorporate my earlier views. (See *In re M.M.* (July 12, 2022, B315997) __ Cal.App.5th __ [2022 WL 2679301].) This problem looks persistent. I would not affirm.


WILEY, J.


2